Kathryn J. Steffey (10245)
ksteffey@smithlawonline.com
Clayton H. Preece (15228)
cpreece@smithlawonline.com
**SMITH HARTVIGSEN, PLLC**
175 South Main St., Suite 300
Salt Lake City, Utah 84111
Telephone (801) 413-1600
Facsimile (801) 413-1620
*Attorneys for Nanea Woods*

D. Scott Crook (7495)
scott@arnoldcrook.com
**ARNOLD & CROOK PLLC**
2150 South 1300 East, Suite 500
Salt Lake City, Utah 84106
Telephone (801) 326-1943
Facsimile (801) 665-1567
*Attorneys for Austen Harris*

---

## IN THE UNITED STATES DISTRICT COURT
## CENTRAL DIVISION, STATE OF UTAH

| | |
|---|---|
| NANEA WOODS, an individual, and AUSTEN HARRIS an individual<br><br>Plaintiffs,<br><br>vs.<br><br>DIXIE STATE UNIVERSITY, a public university of the State of Utah; JASON BOOTHE, in his individual and official capacity; and CATHERRIA TURNER, in her individual and official capacity<br><br>Defendants. | **COMPLAINT**<br><br>Case No. 2:15-cv-00267-PMW<br><br>Magistrate Judge Paul M. Warner |

Plaintiffs Nanea Woods ("**Ms. Woods**") and Austen Harris ("**Ms. Harris**"), by and through their undersigned counsel, for their claims against Defendants Dixie State University ("**Dixie**"), Jason Boothe ("**Director Boothe**") and Catherria Turner ("**Coach Turner**"), complain and allege as follows:

**PARTIES**

1.      Ms. Woods is an individual currently residing in Redwood City, California.

2.      Ms. Harris is an individual currently residing in St. George, Utah.

3.      Dixie is a public university of the State of Utah, governed by the Utah System of Higher Education. The Utah System of Higher Education has its principal office in Salt Lake County, Utah.

4.      Director Boothe is an individual currently residing in St. George, Utah and at all times relevant hereto was Dixie's Athletic Director.

5.      Upon information and belief, Coach Turner is an individual currently residing in Arizona and, at all times relevant hereto, was a resident of Utah and the head coach of Dixie's Women's Basketball Team.

**JURISDICTION AND VENUE**

6.      This Court has original jurisdiction over this case pursuant to 28 U.S.C. § 1331 in accordance with 42 U.S.C. § 2000d *et. seq*, as Dixie receives federal funding.

7.      This Court has supplemental jurisdiction over the remaining claims pursuant to 28 U.S.C. § 1367 as the other claims form part of the same case and controversy giving rise to the Plaintiffs' claims under 42 U.S.C. § 2000d *et seq*.

8.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391.

9.      This Court has personal jurisdiction over the parties to this case because, as set forth in more detail below, each party had sufficient minimum contacts with the State of Utah by residing in, conducting business in, or being an entity of the State of Utah during the times relevant to causes of action alleged herein.

## GENERAL ALLEGATIONS

10.     Ms. Woods and Ms. Harris are former players of the Dixie State University Women's Basketball Team ("**Team**").

11.     Ms. Woods played on the Team during the entire 2012-2013 season and a portion of the 2013-2014 season.

12.     Ms. Harris played on the Team during the 2013-2014 season.

13.     Near the end or after the 2012-2013 season, Dixie terminated the then head coach, Angie Kristensen ("**Coach Kristensen**").

14.     After Coach Kristensen's termination, Dixie hired Coach Turner to fill the position of head coach for the Team.

15.     Director Boothe was Coach Turner's immediate supervisor.

### *Recruitment of Austen Harris*

16.     During the 2012-2013 school year, Ms. Harris attended and played basketball at South Mountain College in Phoenix, Arizona.

17.     In March 2013, after Ms. Harris's last game, Stevie Turner ("**Mr. Turner**"), Coach Turner's father, approached Ms. Harris's parents after the game and explained that his

daughter was Coach Turner and that Coach Turner wanted Ms. Harris to come play for her at a school (Holy Names University located in Oakland, California) where Coach Turner was then coaching. Mr. Turner gave Ms. Harris's parents his card and asked for their phone number.

18.     Mr. Turner repeatedly contacted Ms. Harris's parents after the March 2013 encounter and told them that Coach Turner was relying on what he had told her about Ms. Harris because he was a coach and Coach Turner trusted his judgment.

19.     In May 2013, Coach Turner and Mr. Turner met with Ms. Harris and her parents at a restaurant in Phoenix to discuss Coach Turner's interest in coaching Ms. Harris. This was the first time that Ms. Harris had ever met Coach Turner. During that discussion, Coach Turner disclosed that she had applied for the head coaching position at Dixie and that, if she were hired, Coach Turner would like Ms. Harris to play for her at Dixie. Coach Turner paid for the lunch.

20.     Ms. Harris did not want to live in Utah and Dixie was never under consideration before she spoke with Coach Turner in May 2013. Accordingly, she continued to research and contact other schools. She was offered scholarships at New Mexico Highlands University and Colorado Christian University.

21.     Coach Turner and Mr. Turner continued to contact Ms. Harris. Coach Turner assured Ms. Harris that she would assist Ms. Harris in adjusting to life in Utah and at Dixie, that she would teach Ms. Harris "responsibility, leadership, and teamwork," as well as "cultivate her talents." Additionally, Coach Turner explicitly promised Ms. Harris that Ms. Harris would be "her starting point guard for [her] junior year." Coach Turner also led Ms. Harris to believe that she would receive a scholarship for her senior year as well.

4

22.     Based upon the assurances made by both Coach Turner and Mr. Turner, Ms. Harris determined to enroll at Dixie and join the basketball team. She gave up valuable opportunities at other colleges to do so. The scholarship offers she rejected were valued at approximately $25,000, including tuition, books, room, and board.

*Recruitment of Nanea Woods*

23.     After learning of Coach Kristensen's dismissal, Ms. Woods requested a release from the Team from Dixie due to concerns that Coach Kristensen's departure would weaken the women's basketball program.

24.     Ms. Woods met with Director Boothe and Senior Associate Athletic Director Mo Eckroth ("**Associate Director Eckroth**").

25.     Both Director Boothe and Associate Director Eckroth promoted Coach Turner's abilities and assured Ms. Woods that she would benefit by staying with the Team and playing under Coach Turner.

26.     After Coach Turner officially took the position as head coach, Coach Turner also met with Ms. Woods individually to persuade her to stay with the Team.

27.     Coach Turner came to Ms. Woods's apartment complex to meet with Ms. Woods.

28.     During that conversation, Coach Turner discussed Ms. Woods's future with the Team and Ms. Woods's previous request for release from the Team.

29.     Coach Turner also inquired about events and issues the Team struggled with during the previous season.

5

30.     During this meeting, Coach Turner appealed to the similarities in their backgrounds, stating that such similarities were a "sign from God" that Ms. Woods should stay with the Team.

31.     Coach Turner also leveraged additional personal connections, such as race, religion, gender, and work experience, during the meeting with Ms. Woods to persuade Ms. Woods to stay with the Team.

32.     Relying on the statements and representations from Coach Turner, as well as additional statements from Director Boothe and Associate Director Eckroth, Ms. Woods decided to remain with the Team.

33.     As a result of her decision to stay with the Team, Ms. Woods was given an athletic scholarship from Dixie valued at $11,664.00 for the 2013-2014 school year, with the expectation that Ms. Woods would also receive an additional scholarship for the 2014-2015 school year, which was her last year of eligibility to play under the NCAA's rules.

*Orientation with the Athletic Department*

34.     On August 19, 2013, members of the Team were required to meet together to attend an orientation meeting with the Dixie State Athletic Department. At that meeting, several presentations were made. During the meetings, the members of the Team were given copies of orientation materials, including the Dixie State University Women's Basketball Player Contract (the "**Contract**"), Sportsmanship Code of Conduct and Communication Agreement (the **"Sportsmanship Agreement"**), Athlete-Coach Relationship Agreement (the **"Athlete-Coach Agreement"**), Dixie State Women's Basketball Experience as Discipline (the **"Discipline**

6

**Agreement"**), and the Student Athlete Handbook. All together these documents included at least 150 pages. During that meeting, the athletes were told that they must immediately sign and return the Contract, the Sportsmanship Code, and the Discipline Agreement. No significant time was given for the players to review the documents before they signed them because they were expected to listen to the presentations while reviewing the documents.

35.     On August 19, 2013, Ms. Woods and Ms. Harris signed the Contract.

36.     The Contract required players to abide by certain rules, including a rule which prohibited dating between anyone affiliated with the Women's Basketball Program.

37.     Specifically, rule five of the Contract states:

> No dating (to date meaning as going out with/ being in a relationship with/ having relations with) anyone affiliated within the Women's Basketball Program. This means: coaches can't date coaches; teammates can't date teammates; graduate assistants can't date graduate assistants; managers can't date manager's [sic]; practice team players can't date practice team players; coaches can't date players' [sic]; coaches can't date graduate assistants; coaches can't date manager's [sic]; coaches can't date practice team players; players can't date graduate assistants; graduate assistants can't date manager's [sic]; players can't date practice team players; graduate assistants can't date managers; graduate assistants can't date practice team players, etc.

38.     On August 19, 2013, Ms. Woods and Ms. Harris also signed the Sportsmanship Agreement, the Athlete-Coach Agreement, and the Discipline Agreement.

39.     The Sportsmanship Agreement, Athlete-Coach Agreement, and the Discipline Agreement set out additional rules and standards that the players must follow.

40.     As part of their membership on the Team and as students at Dixie, Ms. Woods and Ms. Harris were informed of, referred to, and reasonably relied upon the policies and procedures contained in the Team Handbook, Dixie's NCAA Compliance Manual, Dixie's Student Handbook, Dixie's Student Athlete Handbook, and Dixie's Policies and Procedures Manual.

*Stevie Turner's Involvement as "Co-Coach"*

41.     Although neither an employee of Dixie nor a member of the Team's coaching staff, Mr. Turner, Coach Turner's father, had considerable involvement in both the Team's practices and games.

42.     Indeed, at the request and invitation of Coach Turner, Mr. Turner coached, supervised, instructed, advised, conversed with, and had repeated physical contact with players, including hugging, during and after practices, making many members of the Team, including Ms. Woods and Ms. Harris, uncomfortable.

43.     Additionally, Mr. Turner was substantially involved in recruiting players, including Ms. Harris, by attending meetings with the players and their parents either with or without Coach Turner present.

44.     Moreover, although not qualified to do so, Mr. Turner attempted to direct the players' conduct regarding medical conditions and treatment.

45.     For example, in November 2013, while practicing for a tournament in Colorado, Ms. Woods collided with another player and sustained a concussion.

46.     After the collision, Ms. Woods was directed by Coach Turner to be examined by a Colorado athletic trainer (the "**Colorado Trainer**").

47.     Coach Turner also instructed Mr. Turner to accompany Ms. Woods to the examination.

48.     Mr. Turner waited outside of the examination room, and when Ms. Woods was directed by the Colorado Trainer not to play or practice due to the concussion, Mr. Turner became irate, yelling at the trainer, challenging the diagnosis, and protesting the recommended precautions.

49.     Mr. Turner also instructed Ms. Woods to disregard the Colorado Trainer's medical diagnosis and get back to practice and play in the tournament.

50.     Believing Mr. Turner's actions to be wholly inappropriate and unprofessional, the Colorado Trainer contacted Dixie's athletic trainer, Jeanie Walker, and informed her of the situation.

51.     Mr. Turners' interactions with players were so intimate and personal that, based on the representations of the Colorado Trainer, Ms. Walker believed that the man the Colorado Trainer complained of was Ms. Woods's father. Ms. Woods clarified the situation with Ms. Walker and informed her that the outburst came from Mr. Turner.

52.     Ms. Walker thereafter instructed Ms. Woods not to play in the tournament.

53.     In addition to his role in practices and at games, Mr. Turner was also provided confidential information regarding the players' performances and conduct by Coach Turner.

*The Turners' Violation of School and NCAA Rules and Regulations*

54.     Throughout the 2013-2014 Basketball Season, Coach Turner and her father repeatedly violated the rules and regulations of both Dixie and the NCAA designed to protect and promote the health and wellbeing of the student athletes.

55.     For instance, Coach Turner instructed the players that they were required to make 500 shots each day, in addition to the regular practices and conditioning, knowing that taking the 500 shots would take a considerable amount of time, and that the extra time required would violate the NCAA's regulations regarding the total amount of time that the student athletes could devote to team activities on a daily and weekly basis.

56.     The players were required to notify Coach Turner via text message both when they began taking the additional shots and when they had completed them.

57.     During an investigation of potential NCAA violations regarding the 500 shot requirement, Coach Turner instructed players to tell the investigators that the shots were voluntary and that they "were doing it on [their] own."

58.     At the conclusion of the NCAA investigation, Coach Turner was disciplined by a "Letter of Reprimand" dated May 19, 2014, in which she was specifically disciplined for, among others violations, "[k]nowingly furnishing or knowingly influencing others to furnish the NCAA or [Dixie] false or misleading information . . ." (A copy of the Letter of Reprimand is attached as **Exhibit A**.)

59.     Moreover, during a two and one-half hour pre-season practice, in which Coach Turner sought to condition the players, Coach Turner prohibited the players from taking water breaks.

60.     In order to condition the players to a level she believed was required, Coach Turner required the players to complete strenuous physical exercises and drills without water.

61.      During this practice, Ms. Woods collapsed and lost consciousness as a direct result of Coach Turner's refusal to allow the players to have water.

62.     As a result of her loss of consciousness, Ms. Woods was hospitalized and was required by Dixie to have an electrocardiogram before being allowed to return to the Team. Although Dixie acknowledged that Coach Turner's refusal to allow the players to have water during the practice resulted in Ms. Woods's loss of consciousness, Dixie refused to reimburse Ms. Woods for all expenses incurred for her medical treatment, including the required electrocardiogram.

### The Turners' Discriminatory Treatment of African-American Players

63.     Throughout the entire 2013-2014 Basketball Season, including the pre-season, Coach Turner and Mr. Turner treated Ms. Woods, Ms. Harris and the other African-American players differently than the non-African-American players on the Team.

64.     Indeed, Coach Turner and her father regularly singled out the African-American players in Team meetings, and Mr. Turner repeatedly and publicly referred to the African-American players by racial slurs, such as the "Sistas."

65.     Additionally, Coach Turner and her father consistently provided more favorable treatment to the non-African-American players and held the African-American players to higher standards of performance, rules, and conduct.

66.     For instance, in December 2013, Mr. Turner told Ms. Harris's parents during a game that the reason his daughter had been hired as Dixie's first black coach was to promote diversity. He then said, referring to the African-American players, that the "Sistas" appeared to be sabotaging the games and that they would be gone before his daughter was so "they better get in their lane and stop being mad." Mr. Turner told Ms. Harris's parents that they should speak to the African-American players about being more compliant—that he did not like that they "rolled their eyes" at him and that they did not work as hard as the "white girls."

67.     In January 2014, Mr. Turner again spoke to Ms. Harris's mother and said that "those 'Sistas' haven't said a word to me since you and your husband" talked to them, "but no big deal—let them keep it up." He said that the players were "just making it hard on themselves with the coach."

68.     In addition to imposing different performance standards on the African-American players, Coach Turner and her father also imposed disproportionate discipline on the African-American players.

69.     For example, during a January 2014 practice, Kaylah Miller, a white player, directly threatened another player, Haley Holmstead.

70.     Specifically, during the practice, when Ms. Miller and Ms. Holmstead began engaging in physical contact, Ms. Miller yelled, "If you touch me again, I'm gonna punch you in the face."

71.     Coach Turner personally witnessed Ms. Miller's direct threat.

72.     Despite the fact that threatening another player with violence is against the Team rules, Coach Turner only verbally reprimanded Ms. Miller for this direct threat.

73.     Ms. Miller was not dismissed from the Team or otherwise penalized in any way.

74.     However, less than one month later, Ms. Woods was dismissed from the Team when she made a general statement that could be interpreted as an indirect threat to another player.

75.     Unlike Ms. Miller, Ms. Woods did not receive a verbal reprimand or warning of any type prior to her dismissal from the Team.

76.     Coach Turner who did not personally hear the statement, and instead relied on the paraphrasing of the statement by various members of the Team.

77.     Additionally, contrary to Dixie's rules and regulations, Ms. Woods was not provided with a Disciplinary Action Form prior to dismissal.

78.     Instead, Ms. Woods received a letter dated February 5, 2015, officially dismissing her from the Team for purportedly violating Team Rule 8 for "verbally attack[ing]" a teammate.

79.     Team Rule 8 states, "[s]tudent-athletes must treat their peers with respect in all their interactions."

80.     After numerous requests, Ms. Woods received a belated copy of the Disciplinary Action Form relating to her dismissal.

81.     The Disciplinary Action Form was written on February 7, 2014, two days after Ms. Woods was dismissed from the Team.

82.     On the same day Coach Turner dismissed Ms. Woods from the Team, Coach Turner contacted the management at Ms. Woods's apartment complex ("**Avalon Management**").

83.     In an attempt to have Ms. Woods removed from her non-university apartment, Coach Turner, with Director Boothe's knowledge, disclosed to Avalon Management Ms. Woods's private and confidential student files, records, and other personal information regarding Ms. Woods's interactions with the Team.

84.     Ms. Woods did not give the written consent required under Dixie Policies and Procedures Section 5, Policy 18, subsection 18.1.9 to release her records to any outside party.

85.     As a result of Coach Turner's unlawful disclosure, Ms. Woods was informed that she was being evicted from her apartment.

86.     Ms. Woods and her family thereafter were required to spend considerable time and effort to convince the Avalon Management to allow her to remain in her apartment.

### *Coach Turner's Religious Discrimination*

87.     Throughout the 2013-2014 Basketball Season, Coach Turner and her father repeatedly and consistently required the Team to engage in religious participation.

88.     For example, Coach Turner required Ms. Woods and Ms. Harris to pray before each game, and she and her father also required the players to say "hallelujah" and "amen" during Team meetings and functions.

89.     On one occasion while the Team was traveling for a game, Coach Turner forced Ms. Woods and two or three other members of the Team to remain on a bus for approximately two hours, with no food or water, while Coach Turner and the remaining players attended church services.

### Coach Turner's Fixation on Sexual Orientation

90.     Coach Turner established a Team rule restricting players from dating other members of the Team.

91.     In September 2013, Coach Turner accused Ms. Harris of violating the Team rule prohibiting dating among players. Ms. Harris was not dating another player and denied the accusation to Coach Turner.

92.     Despite Ms. Harris's denials, Coach Turner repeatedly and frequently claimed that she had "seen the text messages" that showed that Ms. Harris was trying to date another player. Coach Turner, however, refused to show Ms. Harris the purported text messages she relied on.

93.     Additionally, Coach Turner accused Ms. Woods and Ms. Harris of dating each other.

94.     Coach Turner repeatedly asked Ms. Harris what her sexual orientation was.

95.     Coach Turner also repeatedly questioned Ms. Woods about her sexual orientation throughout the 2013-2014 Basketball Season.

96.     Although Ms. Woods informed Coach Turner that she was a heterosexual and had a boyfriend, Coach Turner continued to inquire into Ms. Woods's personal life and sexual activity.

97.     Under the guise of investigating these claims of dating, in a public Team meeting Coach Turner demanded that Ms. Harris disclose her sexual orientation to her teammates. Initially, Ms. Harris refused, but Coach Turner continued the discussion and requested other members of the Team to opine about whether they believed Ms. Harris was dating Ms. Woods.

98.     Thereafter, on multiple occasions during Team meetings, Coach Turner publicly accused Ms. Woods and Ms. Harris of violating the Team rule by engaging in sexual activity with each other.

99.     Specifically, on numerous occasions, Coach Turner accused Ms. Woods and Ms. Harris, in front of the entire Team, of "fooling around" and "hooking up."

100.     Additionally, Coach Turner would require Ms. Harris and Ms. Woods to sit apart from each other on numerous bus trips, while other players were allowed to sit next to each other.

101.     Furthermore, in public Team meetings, Coach Turner stated that Ms. Harris had purportedly disclosed her sexual orientation to her—and often referred to it in discussions.

102.     As a result of Coach Turner's false accusations and conduct, Ms. Woods and Ms. Harris were further segregated from their teammates and suffered significant emotional distress.

*Complaints to Dixie Administration*

103.    Because of the ongoing concerns over the treatment of players, Director Boothe participated in a players' meeting attended by many of the women's basketball players, Coach Turner, and Coach Thigpen. During that meeting, many of the players expressed their concerns about Coach Turner's unfair treatment of them. The complaints included (a) Coach Turner often improperly addressed team member's personal problems in front of the entire Team, (b) Coach Turner made false allegations regarding Ms. Woods and Ms. Harris trying to date each other, (c) Coach Turner's improper statements that Ms. Harris was "high" in front of the entire Team, (d) Coach Turner's use of players to inform on other players, (e) Coach Turner's retaliation against players for bringing concerns to her, (f) Coach Turner's failure to give notice to the players of their alleged violations of Team rules, and (g) Coach Turner's father threatening the African-American players.

104.    During the meeting, Coach Turner also claimed again that Ms. Harris was trying to date Ms. Woods. She claimed that "she saw the text messages" that purportedly said that Ms. Harris was dating Ms. Woods. In that discussion, she claimed that she was speaking about the members of the Team "sleeping together."

105.    On February 1, 2014, Ms. Harris, together with her parents, met with Director Boothe and Associate Director Eckroth and complained about (a) possible recruiting violations, (b) Mr. Turner's improper behavior and involvement with the Team, (c) Coach Turner treating the African-American players differently, (d) Coach Turner improperly singling out Ms. Harris, (e) Coach Turner improperly discussing Ms. Harris's sexual orientation, and (f) Coach Turner

falsely accusing Ms. Harris of being high on drugs. At the conclusion of the meeting, Director Boothe promised that he would look into the matter and report back to the Harrises.

106.    On February 2, 2014, Ms. Harris, together with her parents, met with Coach Turner and Coach Thigpen. During that meeting, Ms. Harris's parents, among other things, raised concerns about Coach Turner's treatment of Ms. Harris, including Coach Turner's treatment of the African-American players, Coach Turner's statements about Ms. Harris's sexual orientation and purported dating of other players.

107.    Also, in or about February 2014, Ms. Harris contacted Dixie's Ombudsman's office. However, the Ombudsman did nothing.

108.    By March 3, 2014, Ms. Harris had not heard back from Director Boothe. Accordingly, Ms. Harris's parents emailed him to inquire about the status of the investigation. In response to the email, Director Boothe, who had not attended the February 2nd Meeting, claimed that Ms. Harris had said she did not know what she was going to do in that meeting, and that he was waiting to hear from Ms. Harris. Ms. Harris then emailed in response, explaining her intentions to stay at Dixie and play for the Team.

109.    By March 9, 2014, Director Boothe still had not responded to Ms. Harris. Accordingly, Ms. Harris's parents contacted the Dean of Students, Del W. Beatty, explaining that Director Boothe was not being responsive to their concerns. Only after contacting Dean Beatty did Director Boothe contact Ms. Harris. However, he did nothing.

110.     On March 17, 2014, Ms. Harris, with her parents, met with Dr. Randy Jasmine, Dixie's Faculty Athletic Representative, to discuss her concerns about fairness, integrity, and welfare.

111.     Dixie failed to take any action to correct the behavior and conduct of Coach Turner.

112.     As a result, Coach Turner continued to discriminate and harass Ms. Harris, Ms. Woods and the remaining African-American players, culminating in the dismissal of all of the African-American players from the Team throughout the spring of 2014.

113.     In May 2014, Dixie finally conducted an investigation into some of the complaints raised by certain players on the Team. Dixie's Title IX Coordinator conducted the investigation.

114.     Although Dixie interviewed Ms. Harris during this investigation, Dixie did not interview Ms. Woods or allow Ms. Woods to participate in any way in the investigation.

115.     The investigator ultimately concluded that Coach

> "Turner engaged in activities that could easily be construed as coercion by asking or telling some players to sign a written statement that the specific incident regarding a player's sexual orientation never occurred. These testimonials have not been included in this investigation. After the seven returning players signed that document, some went to Maureen Eckroth, Senior Women's Athletic Administrator, and said they were not comfortable with their actions and felt they had been forced to sign."

A copy of the Report Title IX Investigation, without appendices is attached as **Exhibit B**.

116.    The investigator also stated that "the assertion that [Coach] Turner [had] asked her players to misrepresent the origin of [the 500 shots goal in another NCAA investigation] was germane" to its investigation of the claims of discrimination.

117.    The investigator ultimately concluded that the investigation was not "able to definitely repudiate or rule out the allegations [of Discrimination and Sexual Harassment]."

### *Coach Turner's Retaliatory Conduct*

118.    When Ms. Harris and Ms. Woods complained of Coach Turner's conduct and resisted her attempts to mischaracterize their friendship as a dating relationship, Coach Turner began to retaliate against them.

119.    For instance, on January 22, 2014, during a practice, Coach Turner accused Ms. Harris of being high on drugs in front of the entire team. When Ms. Harris denied the accusation, Coach Turner called the athletic trainer over and demanded that she check Ms. Harris's eyes to see if they appeared dilated. The trainer did not concur with Coach Turner's assessment.

120.    When Ms. Harris immediately paid for a drug test that showed no drugs in her system and showed the results to Coach Turner, Coach Turner denied ever claiming that Ms. Harris was on drugs. However, Coach Turner refused to play her in the following game.

121.    Additionally, Coach Turner dismissed Ms. Woods from the Team under the pretext that Ms. Woods violated team rules. Accordingly, Ms. Woods was unable to receive a scholarship for the 2014-2015 school year.

122.    At the close of the 2013-2014 season, Coach Turner delivered a Disciplinary Action Form that dismissed Ms. Harris from the Team. Although the discipline form purported

nineteen separate disciplinary violations occurring from September 2, 2013 to March 5, 2014, Coach Turner had never before disclosed those violations to Ms. Harris. Additionally, the alleged violations included the rule that was purportedly violated but gave no factual information from which Ms. Harris could determine how she had violated the rule.

123.    Ms. Harris appealed the dismissal from the Team, but on April 22, 2014, in an email only a few sentences long sent to Ms. Harris from the Athletic Aid Appeals Committee, Ms. Harris's appeal was denied.

124.    After the denial, Ms. Harris met with and sent a letter to Dixie's president, Stephen D. Nadauld, and on May 6, 2014, the University notified Ms. Harris that "the Financial Aid Committee has elected to offer you institutional student aid to attend Dixie State University. . . . The amount of the award is full Dixie State University non-resident tuition and student fees for two consecutive semesters[,] effective fall semester 2014."

125.    Although Ms. Harris was given a scholarship, she requested that she be reinstated on the Team.

126.    On May 30, 2014, Ms. Harris received a letter from Ms. Pamela Montrallo, the Executive Director of Human Resources for Dixie. In that letter, Ms. Montrallo stated that Dixie had investigated the allegations regarding discrimination and sexual harassment within the basketball program, and that "the investigation did not establish a violation of Dixie State University's Discrimination/Sexual Harassment Policy." However, the letter stated Dixie was making "recommendations," including (a) "establishing consistent team rules and sanctions for all intercollegiate athletic teams; (b) providing supplemental team management training for

21

coaches; and, (c) conducting additional training for coaches, student-athletes, and staff members to ensure better understanding of and compliance with all University Policies, as well as NCAA Regulations.

127.    After receiving the letter, Ms. Harris requested a more complete explanation about the recommendations and requested that she be reinstated to the Team.

128.    Finally, on June 19, 2014, Ms. Harris's family received a letter from Director Boothe and Associate Director Eckroth. The letter addressed some of the changes that Dixie planned to incorporate into their athletic programs. However, the letter further stated with regard to "Austen's role on the [basketball] team, that decision must be left entirely up to Coach Turner. We, as the Athletic Director and the Senior Women's Administrator, or any other university personnel, cannot force or mandate to a coach who is or is not on a team." The letter goes on to state, "We must remain separate from all such decisions, and support the coach with her decisions in or to remain objective evaluators of her performance as a coach. The minute we insert ourselves into that process is when we lose our objectivity in the process and prevent ourselves from making educated decisions about her status as a coach."

129.    On October 2, 2014, Ms. Harris, by and through counsel, sent a Notice of Claim in accordance with Utah Code Ann. § 63G-7-401 to Dixie's President, Richard B. Williams.

130.    On or about November 7, 2014, Dixie terminated Coach Turner's employment with the University by letter dated that same date. As indicated in the letter, the reasons for her dismissal were "[w]ithholding critical information from the Athletic Department" and "[c]ommitting [her] 2nd NCAA violation during [her] 18 months of employment." A true and

22

accurate copy of the letter from Dixie terminating Coach Turner's employment (the "**Termination Letter**") is attached as **Exhibit C**.

131.    On December 4, 2014, Ms. Woods, by and through counsel, sent a Notice of Claim in accordance with Utah Code Ann. § 63G-7-401 to Dixie's President, Richard B. Williams.

132.    On December 12, 2014, the Utah Department of Administrative Services, Division of Risk Management denied Ms. Woods's claim and Ms. Harris's claim.

<u>**CAUSES OF ACTION**</u>

<u>**FIRST CAUSE OF ACTION**</u>
**(Title VI Discrimination- Plaintiffs against Dixie)**

133.    Plaintiffs incorporate by reference the foregoing allegations as if fully set forth herein.

134.    Dixie directly, and indirectly, receives federal financial assistance and is therefore subject to the provisions of 42 U.S.C. § 2000(d) *et seq.*

135.    As described in detail above, Coach Turner, acting within her scope of employment as the coach for Dixie's Team, discriminated against Ms. Woods and Ms. Harris based on their race. For example, Coach Turner discriminated against Ms. Woods and Ms. Harris when she:

a.      Directly or indirectly referred to, and/or tolerated others over whom she had authority to refer to, the African-American players as "Sistas";

b.      Enforced different and/or additional requirements and expectations on the African-American players;

c.      Disciplined African-American players disproportionately for purported Team rule violations; and

d.      Dismissed all of the African-American players, including Ms. Harris and Ms. Woods, from the Team.

136.    As described above, the Plaintiffs complained to Dixie officials with authority to address the discrimination and to institute corrective measures. As such, Dixie officials, including Director Boothe, Associate Director Eckroth, Dr. Jasmine, Ms. Mantrolla, as well as, President Nadauld, had actual knowledge of discrimination and failed to adequately respond.

137.    Dixie's inadequate response amounted to deliberate indifference to discrimination.

138.    Moreover, when complaints regarding Coach Turner's discriminatory conduct were made to Dixie, Dixie failed to correct Coach Turner's conduct.

139.    As a direct and proximate result of Coach Turner's actions, Ms. Harris and Ms. Woods suffered significant emotional and psychological strain, and Ms. Harris was required to seek psychological counseling and services.

140.    As a direct and proximate result of Dixie's actions, Ms. Woods and Ms. Harris suffered additional damages, including loss of scholarships, foregone opportunities, and additional expenses related to Coach Turner's and Dixie's conduct in an amount to be determined at trial.

24

WHEREFORE, Plaintiffs demand judgment against Dixie as hereinafter set forth.

## SECOND CAUSE OF ACTION
### (Title IX Discrimination- Plaintiffs against Dixie)

141.    Plaintiffs incorporate by reference the foregoing allegations as if fully set forth herein.

142.    Dixie directly, and indirectly, receives federal financial assistance and is therefore subject to the provisions of 20 U.S.C. § 1681 *et seq.*

143.    As described in detail above, Coach Turner, acting within her scope of employment as the coach for Dixie's Team, discriminated against Ms. Woods and Ms. Harris based on their sex because she believed—based on false assumptions made on her part—that their behavior did not conform to the behavior she would expect of a female. For example, Coach Turner repeatedly required Ms. Harris to proclaim her sexual orientation (while she did not ask the same of other athletes she believed acted consistently with their gender roles), she required Ms. Harris and Ms. Woods to sit apart from each other based on her belief that they did not act according to what she believed was their proper gender role (while she did not require any other players to sit apart from each other), and she repeatedly singled out Ms. Harris and Ms. Woods when discussing the Team dating rules (while she did not do so with the others).

144.    Dixie's inadequate response amounted to deliberate indifference to discrimination.

145.    Moreover, when complaints regarding Coach Turner's discriminatory conduct were made to Dixie, Dixie failed to correct Coach Turner's conduct.

146.    As a direct and proximate result of Coach Turner's actions, Ms. Harris and Ms. Woods suffered significant emotional and psychological strain, and Ms. Harris was required to seek psychological counseling and services.

147.    As a direct and proximate result of Dixie's actions, Ms. Woods and Ms. Harris suffered additional damages, including loss of scholarships, foregone opportunities, and additional expenses related to Coach Turner's conduct in an amount to be determined at trial.

WHEREFORE, Plaintiffs demand judgment against Dixie as hereinafter set forth.

### THIRD CAUSE OF ACTION
#### (Negligence- Ms. Woods against Dixie)

148.    Plaintiffs incorporate by reference the foregoing allegations as if fully set forth herein.

149.    Dixie's policies and procedures created a duty of care owed by Dixie and Coach Turner to Ms. Woods, individually, regarding her personal health and safety during Team sponsored events, practices, and games.

150.    Dixie created, funded, and supervised the Team.

151.    Coach Turner, while acting within her scope as an employee of Dixie, breached this duty on several occasions by, *inter alia*, requiring student athletes to engage in extreme physical activity while withholding water and other means of hydration.

152.    Further, Coach Turner's conduct amounted to a knowing and reckless disregard for the players' health and safety, when she required them to complete the strenuous physical exercise while withholding water and other means of hydration.

26

153.    As a direct and proximate result of Coach Turner's breach of the duty of care, Ms. Woods was injured, resulting in hospitalization and a required electrocardiogram before she was able to return to the Team.

154.    Dixie failed to pay all the costs associated with the hospitalization and electrocardiogram required as a result of Coach Turner's conduct.

155.    As a direct and proximate result of Coach Turner's actions, Ms. Woods suffered damages in an amount to be proven at trial.

WHEREFORE, Ms. Woods demands judgment against Dixie as hereinafter set forth.

## FOURTH CAUSE OF ACTION
### (Violation of Federal Due Process- Plaintiffs against Turner, in her Individual Capacity)

156.    Plaintiffs incorporate by reference the foregoing allegations as if fully set forth herein.

157.    Plaintiffs had a protected interest in their membership with the Team as established by Dixie's Policies and Procedures Manual, Student Handbook, NCAA Compliance Manual, and Dixie's Student Athlete Handbook.

158.    Ms. Woods and Ms. Harris also have a liberty interest in their good names and reputations that is protected by the due process provisions of the Fourteenth Amendments to the United States Constitution.

159.    Coach Turner in her official and individual capacities, acted under the color of state law when she deprived Ms. Woods and Ms. Harris of their rights, privileges, or immunities secured by the Constitution or the laws of the United States.

160.    Specifically, Coach Turner, acting under color of state law, deprived Ms. Woods of her property interest without due process of law as guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution by failing to provide the required notices and hearings mandated by Dixie's Policies and Procedures Manual, Student Handbook, NCAA Compliance Manual, and Dixie's Student Athlete Handbook prior to dismissing her from the Team.

161.    Additionally, Coach Turner, acting under color of state law, deprived Ms. Woods of her liberty interests without due process of law as guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution by failing to provide Ms. Woods with a name clearing hearing after Coach Turner publicly accused Ms. Woods of violating the Team rule prohibiting dating among players and of threatening a fellow player.

162.    Coach Turner, acting under color of state law, deprived Ms. Harris of her property interest without due process of law as guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution. For example, without limitation, Coach Turner acted in violation of Ms. Harris's rights:

      a.    When she failed to give Ms. Harris notice of and a right to respond to violations of Team rules when they allegedly occurred;

      b.    When she failed to give Ms. Harris actual notice of the facts underlying the purported rule violations she was alleged to have committed that purportedly justified Ms. Harris's dismissal from the team on March 20, 2014;

c.      When she did not act as an independent and unbiased decision maker as (a) she had already predetermined the likely outcome of the decision without a willingness to consider Ms. Harris's response, (b) she admittedly relied on unreliable sources for her decisions, and (c) she determined that she would withhold information about the alleged sources of information for the purported violations.

163.    Additionally, Coach Turner, acting under color of state law, deprived Ms. Harris of her liberty interests without due process of law as guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution by failing to provide Ms. Harris with a name clearing hearing after Coach Turner publicly accused Ms. Harris of violating the Team rule prohibiting dating among players and of using illegal drugs.

164.    Defendants' actions have deprived the Plaintiffs of their respective protected property interest without providing them with an appropriate level of process.

165.    Additionally, Defendants' actions have subjected Plaintiffs to a public stigma and have resulted in Ms. Woods being required to transfer schools to complete her education and Ms. Harris being removed from the Team.

166.    Therefore, Plaintiffs are entitled to a judgment against Coach Turner pursuant to 42 U.S.C. § 1983 for compensatory damages in an amount to be proven at trial and to an award of their costs and attorneys' fees pursuant to 42 U.S.C. § 1988.

WHEREFORE, Plaintiffs demand judgment against Coach Turner in her individual capacity as hereinafter set forth.

**FIFTH CAUSE OF ACTION**
**(Violation of Equal Protection- Plaintiffs against Turner, in her Individual Capacity and**
**Director Booth, in his Individual Capacity)**

167.     Plaintiffs incorporate by reference the foregoing allegations as if fully set forth herein.

168.     Defendants have not uniformly and equally brought disciplinary actions for violation of Team, Dixie, and NCAA's rules.

169.     Other players have had incidents similar to the ones for which Ms. Woods and Ms. Harris were dismissed from the Team, but Defendants did not bring any similar disciplinary actions against those players.

170.     These actions, as alleged herein, deprived Ms. Woods and Ms. Harris of equal protection of the laws in violation of the Fourteenth Amendment of the United States Constitution and uniform operation of laws under Article I, Section 24 of the Utah Constitution, causing their damages as alleged herein.

171.     No rational basis or compelling government interest exists for these differences in treatment.

172.     At all relevant times, Defendants, in their official and individual capacities, acted under the color of state law.

173.     As a result of Defendants' actions, Ms. Woods and Ms. Harris suffered damages, including severe emotional distress.

174.     Therefore, Ms. Woods and Ms. Harris are entitled to judgment against Defendants Coach Turner and Director Boothe pursuant to 42 U.S.C. § 1983 and Article I, Section 24 of the

Utah Constitution for compensatory damages in an amount to be proven at trial and to an award of their costs and attorney fees pursuant to 42 U.S.C. § 1988.

WHEREFORE, Plaintiffs demand judgment against the individual Defendants in their individual capacities as hereinafter set forth.

## SIXTH CAUSE OF ACTION
**(Violation of State Due Process- Plaintiffs against Turner, in her Individual Capacity)**

175.    Plaintiffs incorporate by reference the foregoing allegations as if fully set forth herein.

176.    Ms. Woods and Ms. Harris had a property interest, which is protected by Article I, Section 7 of the Utah Constitution, in their membership with the Team, as established by Dixie's Policies and Procedures Manual, Student Handbook, NCAA Compliance Manual, and Dixie's Student Athlete Handbook.

177.    Ms. Woods and Ms. Harris also had a liberty interest in their good name and reputation that is protected by the due process provision of Article I, Section 7 of the Utah Constitution.

178.    Coach Turner violated Ms. Woods's constitutional right of due process as guaranteed by Article I, Section 7 of the Utah Constitution by failing to provide the required notices and hearings mandated by Dixie's Policies and Procedures Manual, Student Handbook, NCAA Compliance Manual, and Dixie's Student Athlete Handbook. Additionally, Coach Turner flagrantly violated Ms. Woods's constitutional right of due process as guaranteed by Article I, Section 7 of the Utah Constitution by failing to provide Ms. Woods with a hearing to contest the

allegations made against her after Defendants published false statements that impugned Ms. Woods's good name, reputation, honor, or integrity.

179.    Coach Turner, acting under color of state law, deprived Ms. Harris of her property interest without due process of law as guaranteed by Article I, Section 7 of the Utah Constitution. For example, without limitation, Coach Turner acted in violation of Ms. Harris's rights:

a.    When she failed to give Ms. Harris notice of and a right to respond to violations of Team rules when they allegedly occurred;

b.    When she failed to give Ms. Harris actual notice of the facts underlying the purported rule violations she was alleged to have committed that purportedly justified Ms. Harris's dismissal from the Team on March 20, 2014;

c.    When she did not act as an independent and unbiased decision maker as (a) she had already predetermined the likely outcome of the decision without a willingness to consider Ms. Harris's response, (b) she admittedly relied on unreliable sources for her decisions, and (c) she determined that she would withhold information about the alleged sources of information for the purported violations.

180.    Additionally, Coach Turner, acting under color of state law, deprived Ms. Harris of her liberty interests without due process of law as guaranteed by Article I, Section 7 of the Utah Constitution by failing to provide Ms. Harris with a name clearing hearing after Coach Turner publicly accused Ms. Harris of violating the Team rule prohibiting dating among players and of using illegal drugs.

181.    As a result of the violation of their constitutional rights, Ms. Woods and Ms. Harris have suffered substantial damages that cannot be adequately redressed by existing remedies or equitable relief.

182.    Therefore, Ms. Woods and Ms. Harris are entitled to a judgment against Defendants for compensatory damages in an amount to be proven at trial.

WHEREFORE, Plaintiffs demand judgment against Coach Turner her in her individual capacity as hereinafter set forth.

## SEVENTH CAUSE OF ACTION
### (Breach of Contract- Plaintiffs against Dixie)

183.    Plaintiffs incorporate by reference the foregoing allegations as if fully set forth herein.

184.    Dixie's Policies and Procedures Manual, Student Handbook, NCAA Compliance Manual, and Dixie's Student Athlete Handbook created an implied contract with Ms. Woods and Ms. Harris.

185.    Specifically, Dixie's Policies and Procedures Manual, Student Handbook, NCAA Compliance Manual, and Dixie's Student Athlete Handbook promise the prohibition of discrimination based on race, religion, gender, and sexual orientation; procedural process for investigating claims of discrimination based on race, religion, gender, or sexual orientation; and the fair and just treatment of students and student athletes.

186.    Dixie's Policies and Procedures Manual Section 5-33(III)(B)(vi) states "Students have a right to be free from illegal discrimination, harassment, and sexual harassment. College

policy prohibits discrimination, harassment, or prejudicial treatment of a student because of his/her race/ethnicity, color, national origin, ethnicity, age, religion, gender, sexual orientation, gender identity/expression, pregnancy, disability, or protected veteran status."

187.    Further, Section 5-33(X) *et seq.* of Dixie's Policy and Procedure Manual sets forth the procedures Dixie must follow in investigating complaints of discrimination against faculty and staff.

188.    Despite Dixie's promises to prohibit discrimination and properly and appropriately investigate all complaints of discrimination, Dixie breached its contract with Plaintiffs when it failed to investigate Ms. Woods's complaints of discrimination and harassment and when it failed to address Coach Turner's unlawful conduct.

189.    Additionally, the Dixie State NCAA Compliance Manual states that "[i]f any student-athlete is disciplined . . . a form is to be filled out and signed by the student-athlete, the coach and the Athletic Director."

190.    Despite Dixie's contractual obligation to impose immediate discipline, it breached its contract with Ms. Harris when it failed to notify her immediately of any discipline being issued at the time of the purported violation and then relied on the alleged occurrence of those infractions to dismiss her from the team months later.

191.    The Dixie Student Athlete Handbook provides the following relevant sections:

    a.    General Code of Conduct:

        i.    "**Professional Responsibilities**. As members of an academic community, staff and coaches must demonstrate respect for student-athletes as

individuals and adhere to their role as leaders, guides and counselors to young

people. . . . Specifically, staff and coaches are expected to avoid any exploitation,

harassment or discriminatory treatment of student-athletes."

    ii.       **"Disciplinary Action**. Staff and coaches who are in violation of

the Code of Conduct and Ethics shall be disciplined.

    b.      Renewal of Athletic Grant-in-Aid

        i.      "Aid may be cancelled if the recipient:

- renders him/herself ineligible for intercollegiate completion, or
- fraudulently misrepresents any information on an application letter of intent or tender, or
- engages in serious misconduct warranting substantial disciplinary penalty, or
- voluntarily withdraws from a sport for personal reasons."

        ii.     "The institution shall notify each returning student-athlete no later

than June 30, if athletic grant-in-aid is not to be renewed for the next year."

192.    As described above, Dixie breached the contract with the Plaintiffs when it failed

to discipline Coach Turner when she violated the Code of Conduct and Ethics and breached the

contract with Ms. Harris when it cancelled her grant-in-aid for a reason not permitted.

193.    As a result of Dixie's breach of contract, Ms. Woods and Ms. Harris suffered

damages in an amount to be proven at trial.

WHEREFORE, Plaintiffs demand judgment against Dixie as hereinafter set forth.

## EIGHTH CAUSE OF ACTION
### (Defamation- Plaintiffs against Coach Turner)

194.     Plaintiffs incorporate by reference the foregoing allegations as if fully set forth herein.

195.     Throughout the 2013-2014 Basketball Season, Coach Turner falsely accused Ms. Woods and Ms. Harris of violating the Team rule prohibiting dating among players by engaging in sexual activity with each other.

196.     Coach Turner's accusations were made during Team meetings with all members of the Team present.

197.     Additionally, after dismissing Ms. Woods from the Team, Coach Turner falsely accused Ms. Woods of violence and insisted that she be removed from her apartment.

198.     Each of the above-identified statements made by Coach Turner are false and have impeached the Plaintiffs' honesty, integrity, virtue, chastity, and reputation, thereby exposing them to public hatred, contempt, and ridicule.

199.     Coach Turner acted willfully in publishing the false statements concerning the Plaintiffs.

200.     Coach Turner made the defamatory statements with knowledge that they were false or with reckless disregard of whether they were false or not.

201.     As a result of the publication of Coach Turner's false and malicious statements, the Plaintiffs have been injured in an amount to be determined at trial.

WHEREFORE, Plaintiffs demand judgment against Coach Turner as hereinafter set forth.

## NINTH CAUSE OF ACTION
**(Invasion of Privacy and False Light- Ms. Woods against Coach Turner)**

202.    Plaintiffs incorporate by reference the foregoing allegations as if fully set forth herein.

203.    As described herein, Coach Turner accused Ms. Woods on multiple occasions of engaging in a sexual relationship with Ms. Harris.

204.    Additionally, Coach Turner represented to Ms. Woods's landlord that Ms. Woods was a physical threat to her roommates and must be evicted from her apartment.

205.    The statements made by Coach Turner gave publicity to a matter concerning Ms. Woods that placed Ms. Woods in a false light.

206.    The false light in which Ms. Woods was placed would be highly offensive to a reasonable person.

207.    Coach Turner had knowledge of the falsity or acted in reckless disregard to the falsity of the statements she willfully publicized regarding Ms. Woods's sexual activity and propensity for violence and the false light in which Ms. Woods was placed.

208.    Coach Turner's conduct was willful and malicious.

209.    As a result of Coach Turner's statements, Ms. Woods has sustained damages in an amount to be determined at trial.

WHEREFORE, Ms. Woods demands judgment against Coach Turner as hereinafter set forth.

### TENTH CAUSE OF ACTION
**(Intentional Interference with Contractual Relations- Ms. Woods against Coach Turner and Director Boothe)**

210.    Plaintiffs incorporate by reference the foregoing allegations as if fully set forth herein.

211.    Ms. Woods had a contractual relationship with Avalon Apartments, in which Ms. Woods rented an apartment from Avalon that was used as Ms. Woods's residence.

212.    Ms. Woods also had a contractual relationship with Dixie, in which Ms. Woods was provided with a scholarship in exchange for her participation on the Team.

213.    Coach Turner intentionally interfered with Ms. Woods's contractual relationships by making false representations about Ms. Woods.

214.    Coach Turner interfered with Ms. Woods's contractual relationships for an improper purpose in that Coach Turner sought to injure Ms. Woods.

215.    Coach Turner's interference with Ms. Woods's contractual relationships was through improper means, including, but not limited to, unlawfully disclosing Ms. Woods's confidential school records.

216.    Director Boothe intentionally interfered with Ms. Woods's contractual relationships by encouraging, or allowing through inaction, false representations to be made about Ms. Woods.

217.    Director Boothe's intentional interference with Ms. Woods's contractual relationships was through improper means, including, but not limited to, encouraging or allowing through inaction, the unlawful disclosure of Ms. Woods's confidential school records.

218.    Both Coach Turner's and Director Boothe's conduct was willful and malicious.

219.    As a result of Coach Turner's and Director Boothe's conduct, Ms. Woods sustained damages in an amount to be determined at trial.

WHEREFORE, Ms. Woods demands judgment against Coach Turner and Director Boothe as hereinafter set forth.

## ELEVENTH CAUSE OF ACTION
### (Invasion of Privacy-Making Public Private Facts-Harris against Turner)

220.    Plaintiffs incorporate by reference the foregoing allegations as if fully set forth herein.

221.    As discussed above, Coach Turner on numerous occasions publicly disclosed to Ms. Harris's fellow teammates her sexual orientation.

222.    Ms. Harris's sexual orientation is a private fact.

223.    Coach Turner's public disclosure of this information would be highly offensive and objectionable to a reasonable person.

224.    Coach Turner's conduct was willful and malicious.

225.    As a direct and proximate cause of Coach Turner's behavior, Ms. Harris has suffered damages in an amount to be proven at trial.

WHEREFORE, Ms. Harris demands judgment against Coach Turner as hereinafter set forth.

### TWELFTH CAUSE OF ACTION
**(Invasion of Privacy-False Light-Plaintiffs against Turner)**

226.    Plaintiffs incorporate by reference the foregoing allegations as if fully set forth herein.

227.    As described above, Coach Turner gave publicity to a matter concerning Ms. Harris and Ms. Woods that placed each of them in a false light, i.e., that they were engaged in a sexual relationship.

228.    Such an allegation was highly offensive and would be highly offensive to a reasonable person.

229.    Coach Turner knew or acted in reckless disregard of the falsity of the matter and the false light in which it placed Ms. Harris and Ms. Woods.

230.    Coach Turner's conduct was willful and malicious.

231.    As a direct and proximate result of Coach Turner's behavior, the Plaintiffs were damaged in an amount to be determined at trial.

WHEREFORE, Plaintiffs demand judgment against Coach Turner as hereinafter set forth.

## THIRTEENTH CAUSE OF ACTION
**(Negligent Supervision-Plaintiffs against Dixie and Director Boothe)**

232.    Plaintiffs incorporate by reference the foregoing allegations as if fully set forth herein.

233.    Dixie as the employer of Coach Turner had a duty to supervise her performance.

234.    Director Boothe, as a direct supervisor of Coach Turner, had a duty to supervise her performance.

235.    As described above, Dixie, despite specific and detailed knowledge of Coach Turners' behavior, breached its duty to supervise as a reasonable employer would.

236.    As described above, Director Boothe, despite specific and detailed knowledge of Coach Turner's behavior, breached his duty to supervise as a reasonable supervisor would.

237.    Director Boothe acted willfully in failing to supervise Coach Turner.

238.    As a direct and proximate cause of Dixie's and Director Boothe's breach, the Plaintiffs have suffered damages in an amount to be proven at trial.

WHEREFORE, Plaintiffs demand judgment against Dixie and Director Boothe as hereinafter set forth.

## JURY DEMAND

Ms. Woods and Ms. Harris demand a trial by jury of all issues in this action.

## PRAYER FOR RELIEF

WHEREFORE, Ms. Woods and Ms. Harris request that the Court enter judgment in their favor and against the Defendants and award Ms. Woods and Ms. Harris the following relief:

1.      As to the First Cause of Action, damages in an amount to be determined at trial for Dixie's and Coach Turner's unlawful discrimination against Ms. Woods and Ms. Harris on the basis of race, plus attorney fees and costs as permitted under 42 U.S.C. § 1988(b);

2.      As to the Second Cause of Action, damages in an amount to be determined at trial for Dixie's and Coach Turner's unlawful discrimination against Ms. Woods and Ms. Harris on the basis of sex, plus attorney fees and costs as permitted under 42 U.S.C. § 1988(b);

3.      As to the Third Cause of Action, an award against Dixie to Ms. Woods of damages in the amount to be determined at trial;

4.      As to the Fourth Cause of Action, damages in an amount to be determined at trial for Coach Turner's unlawful deprivation of Ms. Woods's and Ms. Harris's due process rights guaranteed by the United States Constitution, as well as judgment against Coach Turner, pursuant to 42 U.S.C. § 1988, for Ms. Woods's and Ms. Harris's costs and attorneys' fees incurred herein;

5.      As to the Fifth Cause of Action, damages in an amount to be determined at trial for Coach Turner's and Director Boothe's unlawful deprivation of Ms. Woods's and Ms. Harris's right to equal protection guaranteed by the United States Constitution, as well as judgment against Coach Turner and Director Boothe, pursuant to 42 U.S.C. § 1988, for Ms. Woods's and Ms. Harris's costs and attorneys' fees incurred herein;

6.    As to the Sixth Cause of Action, damages in an amount to be determined at trial for Coach Turner's unlawful deprivation of Ms. Woods's and Ms. Harris's right to due process guaranteed by the Utah Constitution;

7.    As to the Seventh Cause of Action, damages in an amount to be determined at trial for Dixie's breach of contract with Ms. Woods and Ms. Harris;

8.    As to the Eighth Cause of Action, an award against Coach Turner to Ms. Woods and Ms. Harris in an amount to be determined at trial for the defamatory statements.

9.    As to the Ninth Cause of Action, an award to Ms. Woods of damages in an amount to be determined at trial for invasion of privacy and false light in which Ms. Woods was placed by Coach Turner;

10.   As to the Tenth Cause of Action, damages in an amount to be determined at trial for damages, costs, and lost opportunities as a result of Coach Turner's and Director Boothe's intentional interference with Ms. Woods's contractual relations;

11.   As to the Eleventh Cause of Action, damages against Coach Turner in an amount to be determined at trial for the damages caused by Coach Turner's disclosure of private facts.

12.   As to the Twelfth Cause of Action, damages against Coach Turner to Ms. Harris and Ms. Woods for Coach Turner's statements casting them in a false light;

13.   As to the Thirteenth Cause of Action, damages against Dixie and Director Boothe for their negligent supervision of Coach Turner;

14.     Ms. Woods's and Ms. Harris's attorney fees, costs and expenses as authorized by statute, including but not limited to 42 U.S.C. § 1988 or other such law as the Court may find applicable; and

15.     Such other and further relief as this Court deems just and equitable.

**DATED** this 15th day of April, 2015.

                              Respectfully submitted,

                              */s/ Kathryn J. Steffey*
                              Kathryn J. Steffey
                              Clayton H. Preece
                              **SMITH HARTVIGSEN, PLLC**
                              *Attorneys for Nanea Woods*


                              */s/ D. Scott Crook*
                              (Electronic Signature affixed by Kathryn J. Steffey
                              with permission)
                              D. Scott Crook
                              **ARNOLD & CROOK PLLC**
                              *Attorneys for Austen Harris*

Plaintiff's Addresses:
c/o Clayton H. Preece
SMITH HARTVIGSEN, PLLC
175 South Main Street, Suite 300
Salt Lake City, Utah 84111


c/o D. Scott Crook
ARNOLD & CROOK PLLC
2150 South, 1300 East, Suite 500
Salt Lake City, Utah 84106
4815-6262-9153, v. 15